IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | |
|---|---|
| COLTON REBER, | ) Civil No. 2:08-CV-051BSJ |
| | ) |
| Petitioner, | ) **MEMORANDUM OPINION** |
| | ) **& ORDER** |
| vs. | ) **(28 U.S.C. § 2254(d))** |
| | ) |
| HON. LARRY A. STEELE, and MARK | ) |
| L. SHURTLEFF, Utah Attorney General, | ) |
| | ) |
| Respondents. | ) |

```
┌─────────────────────────────────────┐
│              FILED                   │
│   CLERK, U.S. DISTRICT COURT         │
│   February 14, 2008 (4:04pm)         │
│         DISTRICT OF UTAH             │
└─────────────────────────────────────┘
```

* * * * * * * * *

On January 16, 2008, Colton Reber filed a petition pursuant to 28 U.S.C. § 2254, challenging his March 18, 2004 adjudication as a delinquent by the Eighth District Juvenile Court, State of Utah, where he avers he is currently awaiting sentencing. According to Reber, the juvenile court found that he violated Utah Code Ann. § 23-20-4(3)(a) (wanton destruction of protected wildlife) during the 2002 deer hunting season by shooting and killing a trophy buck mule deer within the exterior boundaries of the Uintah and Ouray Indian Reservation without a valid State hunting license. Reber alleges that he is a member of the Uintah Band of Indians, and that as such, he possesses hunting rights that are counted among the various rights of user reserved to the Band under the Executive Order of October 3, 1861, and the Act of May 5, 1864, ch. 57, 13 Stat. 64, which set apart the Uintah Indian Reservation for their use and occupancy.[1]

---

[1]Though Reber makes passing reference to "treaty" hunting rights, the original Uintah Indian Reservation "was created by executive order and approved by an act of Congress." *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1202 (10th Cir. 2002) (footnote omitted). The 1864 Act set apart the entire Uintah Valley for "the permanent settlement and

(continued...)

Reber asserts that the State of Utah does not have jurisdiction to regulate or punish the exercise of his hunting rights as a member of the Uintah Band within the reservation's boundaries.

Reber has previously raised this claim on direct appeal from the juvenile court's judgment to the Utah Court of Appeals, where he prevailed, *State of Utah in the Interest of C.R.*, 2005 UT App 486 (unpublished disposition); *see State of Utah v. Reber*, 2005 UT App 485, 128 P.3d 1211, and on review by the Utah Supreme Court, which reversed the court of appeals and reinstated the juvenile court's finding of delinquency. *State of Utah v. Reber*, 2007 UT 36, 171 P.3d 406. On October 29, 2007, the United States Supreme Court denied Reber's petition for certiorari. *Reber v. Utah*, 128 S. Ct. 490 (2007).

He now raises his claim in this forum under § 2254, asking this court to vacate the Eighth District Juvenile Court's adjudication of delinquency and prohibit the Attorney General of Utah and the juvenile court from exercising jurisdiction over him contrary to the 1864 Act and the Tenth Circuit's ruling in *Ute Indian Tribe v. State of Utah*, 114 F.3d 1513 (10th Cir. 1997).[2]

### Relief Under 28 U.S.C.A. § 2254

"Federal courts may grant habeas relief to prisoners held by state authorities only when the habeas petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Foster v. Booher*, 296 F.3d 947, 949 (10th Cir. 2002) (quoting 28 U.S.C. § 2254(a)). To obtain federal habeas corpus relief, a person in State custody must file a petition

---

[1](...continued)
exclusive occupancy of Utah Indian tribes [and] recognized and guaranteed the Indian rights of the tribes who settled there." *Id.* Those tribal rights included the right to hunt. *Id.* ("'As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them . . . .'" (citation omitted)).

[2]Nearly identical § 2254 petitions were also filed by two other *Reber* appellees: Petitioner's father, Rickie L. Reber (*Reber v. Payne*, Civil No. 2:08-CV-50TS (D. Utah, filed January 16, 2008)), and Tex William Atkins (*Atkins v. Payne*, Civil No. 2:08-CV-52DAK (D. Utah, filed January 16, 2008)).

under 28 U.S.C.A. § 2254 (2006) in a federal district court, as Reber has done.

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts directs that

> [t]he clerk must promptly forward the petition to a judge under the court's assignment procedure, and the judge must promptly examine it.  If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.

Reber's petition was promptly forwarded by the Clerk, and promptly examined by this court.

### Section 2254's "in custody" Requirement

In order to satisfy § 2254's jurisdictional prerequisites, Reber must be "in custody pursuant to the judgment of a State court," 28 U.S.C.A. § 2254(a), and must have been "'in custody' under the conviction or sentence under attack at the time his petition is filed."  *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989).  A petitioner need not show actual, physical custody to obtain relief.  *Id.* at 491.  As the court of appeals explains, "A petitioner is in custody for purposes of the statute if he or she is subject to 'severe restraints on [his or her] individual liberty.' . . .  A restraint is severe when it is 'not shared by the public generally.'"  *Dry v. CFR Court of Indian Offenses for Choctaw Nation*, 168 F.3d 1207, 1208 (10th Cir. 1999) (quoting *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973), and *Jones v. Cunningham*, 371 U.S. 236, 240 (1963)).  In *Dry*, the court of appeals concluded that criminal defendants who had been released on their own recognizance pending trial were "in custody" for purposes of 28 U.S.C.A. § 2241 (2006), the general federal habeas statute:

> Although Appellants are ostensibly free to come and go as they please, they

-3-

remain obligated to appear for trial at the court's discretion. This is sufficient to meet the "in custody" requirement of the habeas statute. *See Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 300-01, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (concluding petitioner released on his own recognizance, after his conviction was vacated on application for a new trial, was "in custody" for purposes of habeas corpus statute); *Kolski v. Watkins*, 544 F.2d 762, 763-64 and n. 2 (5th Cir. 1977) (holding petitioner released on his own recognizance after arrest was "in custody"); *United States ex rel. Scranton v. New York*, 532 F.2d 292, 293-94 (2d Cir. 1976) (concluding petitioner released on her own recognizance after indictment was in custody because she could be ordered to appear before the court at any time);. . . .

*Id.* (additional citations omitted).

Though Reber has been adjudicated delinquent by the Eighth District Juvenile Court, Reber's § 2254 Petition acknowledges that at the time it was filed, he had not yet been sentenced by that court.  Nonetheless, the Utah Court of Appeals treated Reber's adjudication of delinquency as "a juvenile court judgment" ripe for review on direct appeal, *see State of Utah in the Interest of C.R.*, 2005 UT App 486 (unpublished disposition), as did the Utah Supreme Court, *see State of Utah v. Reber*, 2007 UT 36, 171 P.3d 406.  *Cf.* Utah R. Juv. P. 44(a), 52(a).

Though he is not currently in physical detention, Reber ostensibly remains legally obligated to appear before the Eighth District Juvenile Court for sentencing based upon the prior adjudication of his delinquency, and he thus remains "in custody" pursuant to a State court judgment.  Therefore, this court has jurisdiction under § 2254 to consider his federal claim.

**Section 2254's Exhaustion Requirement**

Procedurally, "[a] habeas petitioner is 'generally required to exhaust state remedies whether his action is brought under § 2241 or § 2254 .'"  *Hamm v. Saffle*, 300 F.3d 1213, 1216 (10th Cir. 2002) (quoting *Montez v. McKinna*, 208 F.3d 862, 866 (10th Cir. 2000)); *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("This Court has long held that a state prisoner's federal

habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims.").[3]

> This court cannot address claims that were defaulted in state court on independent and adequate state procedural grounds unless [Petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* (internal quotation marks omitted).  Section 2254(b)(1) expressly states that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that— (A) the applicant has exhausted the remedies available in the courts of the State," unless "circumstances exist that render such process ineffective to protect the rights of the applicant."  Section 2254(c) amplifies this requirement: "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

> Read narrowly, [the] language [of § 2254(c)] appears to preclude a finding of exhaustion if there exists any possibility of further state-court review.  We have,

---

[3]In part, this exhaustion requirement is grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  As the Court explained in *Rose v. Lundy*, 455 U.S. 509 (1982):

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.  *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-491 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution."  *Ex parte Royall*, 117 U.S., at 251.  Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."  *Darr v. Burford*, 339 U.S. 200, 204 (1950).

455 U.S. at 518.

however, expressly rejected such a construction, *Brown v. Allen*, 344 U.S. 443, 448-49, n. 3 (1953), holding instead that once the state courts have ruled upon a claim, it is not necessary for a petition "to ask the state for collateral relief, based upon the same evidence and issues already decided by direct review." *Id.* at 447. This interpretation reconciles § 2254(c) with § 2254(b), which provides that federal habeas review will lie where state corrective processes are "ineffective to protect the rights of the prisoner." It would be inconsistent with the latter provision, as well as with underlying principles of comity, to mandate recourse to state collateral review whose results have effectively been predetermined, or permanently to bar from federal habeas prisoners in States whose post-conviction procedures are technically inexhaustible.

*Castille v. Peoples*, 489 U.S. 346, 350 (1989). In *Dever v. Kansas State Penitentiary*, 36 F.3d 1531 (10th Cir. 1994), the court of appeals explained that the § 2254(b)(1) exhaustion requirement is satisfied if the petitioner's federal issue "has been properly presented to the highest state court," either by direct review of the state court judgment or in a post-conviction attack. *Id.* at 1534 (citing 17A Charles A. Wright, et al., *Federal Practice and Procedure* § 4264.1, at 339-42 (2d ed. 1988)[4]).

Reber submits that each of the five grounds for relief raised in his § 2254 Petition were presented to the Utah Court of Appeals and the Utah Supreme Court, though the written opinions issued by those courts do not explicitly address all of the grounds thus raised.

On a preliminary basis, at least, this court is satisfied that Reber's federal claims have been properly presented to the highest State court on direct review of the Eighth District Juvenile Court's adjudication of his delinquency, and § 2254(b)(1)'s exhaustion requirement has thus

---

[4]The current edition of the treatise says this:

The exhaustion requirement is satisfied if the federal issue has been once presented to the highest state court, provided that it has been properly presented. The federal claim must have been presented to the highest court of the state, either on direct review of the conviction or in a post-conviction attack, except in quite unusual circumstances. The exhaustion requirement is satisfied, however, even if the highest state court exercises discretion not to review the case or does not discuss the federal issue.

17B Charles A. Wright, *Federal Practice and Procedure* § 4264.1, at 234-42 (3d ed. 2007) (footnotes omitted).

been satisfied.[5]

### Rule 4 Preliminary Review of the Merits

Whether "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief" within the meaning of Rule 4 of the Rules Governing Section 2254 Proceedings must be measured using the standards that govern the § 2254 remedy.  Under § 2254(d),[6] "Relief is permissible only if the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Smith v. Dinwiddie*, 510 F.3d 1180, 1185 (10th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)).[7]

---

[5]Even if the exhaustion requirement had not been satisfied as to every federal issue now raised, this court would decline to stay the petition and hold it in abeyance, and would proceed instead to address all the claims on the merits.  *See Rhines v. Weber*, 544 U.S. 269, 277-78 (2005); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[6]28 U.S.C.A. § 2254(d) reads:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[7]Relief under § 2254 is also available where the State court judgment is grounded upon "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C.A. § 2254(d)(2).  Under § 2254(d)(2), any subsidiary factual findings by the state court are presumptively correct, and a petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C.A. § 2254(e)(1).  Under § 2254(e)(1), a federal district court defers to subsidiary interpretations of state law by the state courts.  *See Davis v. Executive Director of Dept. of Corrections*,100 F.3d 750, 771 (10th Cir. 1996); *Bowser v. Boggs*, 20 F.3d 1060, 1065 (10th Cir.) ("We will not second guess a state court's application or interpretation of state law on a petition for habeas unless such application or interpretation violates federal law."), *cert. denied*, 513 U.S. 926 (1994); *see also Mansfield v. Champion*, 992 F.2d 1098, 1100 (10th Cir. 1993) ("In a habeas corpus proceeding under section 2254, a federal court should defer to a state court's interpretation of state law . . . .").

Reber's Petition appears to rely upon the "contrary to clearly established federal law" standard of § 2254(d)(1) rather than the "unreasonable determination of the facts" standard of § 22564(d)(2).  Reber admits hunting and killing his

(continued...)

For a decision to be "contrary to . . . clearly established federal law,"

> a petitioner could show that the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or that the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [their] precedent.

*Id.* at 1186 (quoting *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (internal quotation marks and alterations omitted)); *see Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Young v. Sirmons*, 486 F.3d 655, 662-63 (10th Cir. 2007); *Torres v. Lytle*, 461 F.3d 1303, 1311 (10th Cir. 2006). For a state court's decision to involve an "unreasonable application of clearly established federal law,"

> a petitioner must show the state court's application of federal law was "objectively unreasonable," which means "most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Id.* at 671. "It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision. . . . [T]he state court decision must be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable."

*Id.* (quoting *Maynard*, 468 F.3d at 671 (internal quotation marks omitted)).[8]

Moreover, the Tenth Circuit has ruled that "the only federal law that can be clearly established for purposes of" post-conviction collateral review under § 2254(d) appeal "is Supreme Court precedent interpreting the Constitution." *Id.*

---

[7] (...continued)
first deer without a state or tribal license or permit, as the juvenile court found, and he does not assert that the animal died as a consequence of mistake, accident or negligence.

[8] *See also Cummings v. Sirmons* 506 F.3d 1211, 1222 (10th Cir. 2007):

"When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie*, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." *Id.* "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." *Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir. 2007) (internal quotation marks omitted).

> We may not rely upon non-constitutional Supreme Court decisions to determine whether § 2254(d) relief is appropriate.  Precedents not based on constitutional grounds are "off the table as far as § 2254(d) is concerned."  *Early v. Packer*, 537 U.S. 3, 10, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).  Nor may we look to circuit court decisions or Supreme Court decisions interpreting federal common law.  *See id.* (holding inapplicable precedents "based on [the Court's] supervisory power over the federal courts, and not on constitutional grounds").

*Id.*

Thus the scope of collateral review of a State court judgment in a § 2254 proceeding proves to be narrow indeed.

### *State of Utah v. Reber* and "Clearly Established Federal Law"

To prevail under § 2254, Reber must show that the Utah Supreme Court's decision in *State of Utah v. Reber*, 2007 UT 36, 171 P.3d 406, affirming the Eighth District Juvenile Court's adjudication of his delinquency is "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Smith v. Dinwiddie*, 510 F.3d at 1185 (quoting 28 U.S.C. § 2254(d)(1)).  To that end, Reber argues that (1) the juvenile court denied him due process under the Fourteenth Amendment by "eliminating intent as an element of the offense charged," largely by rejecting his "ignorance or mistake of law" defense; and (2) the juvenile court lacks jurisdiction over members of federally recognized Indian tribes exercising their hunting rights within the boundaries of an Indian reservation, including Reber, who asserts that he is a member of the Uintah Band of Indians.

### (1) Reber's Ignorance or Mistake of Law Defense

Reber asserts that he raised the defense before the juvenile court that, in killing the deer in 2002 for which he was charged, he was acting "solely at the direction of his father," whose direction ostensibly was based upon a reading of applicable federal statutory and case law that

indicates that members of the Uintah Band of Indians have the right to hunt within the

boundaries of the Uintah and Ouray Indian Reservation free of state regulation whether or not

they are enrolled members of the Ute Indian Tribe of the Uintah and Ouray Reservation.

As Reber points out, the defense of  "ignorance or mistake of fact or law" is recognized

by Utah Code Ann. § 76-2-304(2), which reads:

> (2) Ignorance or mistake concerning the existence or meaning of a penal law is no
> defense to a crime unless:
>
>   (a) Due to his ignorance or mistake, the actor reasonably believed his conduct
> did not constitute an offense, and
>
>   (b) His ignorance or mistake resulted from the actor's reasonable reliance
> upon:
>
> >   (i) An official statement of the law contained in a written order or grant
> > of permission by an administrative agency charged by law with
> > responsibility for interpreting the law in question; or
> >
> >   (ii) A written interpretation of the law contained in an opinion of a
> > court of record or made by a public servant charged by law with
> > responsibility for interpreting the law in question.[9]

But § 76-2-304(2) recognizes this defense as a matter of Utah law, not of "clearly established

federal law."  Beyond that, Reber cites no legal authority—state or federal—for his further

assertion that "a minor cannot be held criminally responsible for acts committed at the direction

of a responsible adult," (Petition at 7), even assuming that the adult gives such direction based

upon ignorance or mistake of law within the meaning of § 76-2-304(2), as Reber appears to

argue.

---

[9]"The language of section 76-2-304 clearly and unambiguously requires a written interpretation, by either a
court of record or a public servant, in order for mistake of law to be an available defense."  *State v. Norton*, 2003 UT App
88, ¶ 13, 67 P.3d 1050, 1053.

"The rule that 'ignorance of the law will not excuse' is deep in our law . . . ." *Lambert v. California*, 355 U.S. 225, 228 (1957) (quoting *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68 (1910) (observing that "innocence cannot be asserted of an action which violates existing law, and ignorance of the law will not excuse")).  Generally, under current State criminal laws, "ignorance or mistake of fact or law is a defense when it negatives the existence of a mental state essential to the crime charged." 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.1, at 575 (1986) (footnote omitted).[10]  Under the Utah statute, if the requisites of § 76-2-304(2) are met, ignorance or mistake of law becomes a question of reasonable conduct under the circumstances.[11]

Absent clear authority transmuting a state court's fact-driven application of a state statutory "ignorance or mistake of fact or law" defense into a matter of federal constitutional Due

---

[10]In this instance, to be found guilty of wanton destruction of protected wildlife under Utah Code Ann. § 23-20-4, Reber must be found to have captured, injured, or destroyed protected wildlife through "intentional, knowing, or reckless conduct as defined in Section 76-2-103," Utah Code Ann. § 23-20-4(1)(c)(i), or to have done so under other circumstances apparently absent in this case (e.g., at night with the use of a weapon).

[11]Reber asserts that in hunting and killing his first deer in 2002, he relied upon the instructions and advice of his father, not upon his own reading of "[a] written interpretation of the law contained in an opinion of a court of record or made by a public servant charged by law with responsibility for interpreting the law in question," as Utah Code Ann. § 76-2-304(2) unambiguously requires.  Even if the Petitioner had read the Tenth Circuit's opinion in *Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002), to mean what his father ostensibly told him it meant—that hunting on the Uintah and Ouray Reservation without a state or tribal license or permit did not constitute an offense because it was their "inherent tribal right" to do so as members of the Uintah Band—it plainly appears that he cannot show that the State juvenile court made an "unreasonable determination of the facts" in concluding that the Rebers did *not* reasonably rely on *Timpanogos Tribe* for purposes of Utah Code Ann. § 76-2-304(2).

*Timpanogos Tribe* does *not* hold that the Uintah Band or anyone else has the right to hunt on Reservation lands free of federal, state and tribal regulation.  It does say that a claim of tribal hunting rights raises a federal question within the jurisdiction of the federal courts, but the *Timpanogos* panel did not undertake to decide whether the Timpanogos Tribe has such rights, or to define what those rights may be.  *Timpanogos Tribe* cannot fairly be read in isolation from other Tenth Circuit case law on the subject, such as *United States v. Felter*, 752 F.2d 1505 (10th Cir. 1985), which held that persons listed on the Final Mixed-Blood Roll retained their tribal hunting and fishing rights, and *United States v. Murdock*, 132 F.3d 534, 535 (10th Cir. 1997), which held that their descendants do not have such rights and that the Uintah Band of Indians has no hunting rights independent of the Ute Indian Tribe.

Reber thus would not be entitled to relief under the "unreasonable determination of the facts" standard of § 2254(d)(2).

Process under the Fourteenth Amendment,[12] this ground for relief simply fails to raise a *federal* issue concerning whether Reber is "in custody in violation of the Constitution or laws or treaties of the United States." It thus cannot serve as the basis for relief under § 2254(d)(1).

### (2) Reber's Tribal Hunting Rights Claim

Reber's jurisdictional claim rests upon several premises: (1) the State cannot exercise jurisdiction over a member of a federally recognized Indian tribe hunting on tribal lands; (2) an Indian tribe's determination of its membership is binding upon a State court; (3) the Uintah Band of Indians continues to exist as a federally recognized Indian tribe separate and apart from the Ute Indian Tribe of the Uintah and Ouray Reservation; (4) the Uintah Band retains tribal hunting rights on the Uintah and Ouray Reservation; and (5) a member of the Uintah Band of Indians born prior to the 1954 enactment of the Ute Partition Act (UPA)[13] and not included by name on

---

[12]Reber's § 2254 Petition cites no authority on this issue, but his earlier Petition for Certiorari cited two cases: *Bouie v. City of Columbia*, 378 U.S. 347 (1964), and *Cox v. Louisiana*, 379 U.S. 559 (1965). *Bouie* offers no direct support for Reber's Due Process claim. *Bouie* held that a new judicial construction of a criminal statute "may not be applied retroactively . . . to impose criminal penalties for conduct committed at a time when it was not fairly stated to be criminal," a limitation akin to that imposed by the Constitution's Ex Post Facto Clause (U.S. Const., Art. I, § 9). *Id.* at 362. *Cox* invoked a form of estoppel where the defendant had relied on the assurances of government authorities that his contemplated conduct (picketing near a courthouse) was lawful, only to be prosecuted for such conduct; "to sustain appellant's later conviction for demonstrating where [public officials] told him he could 'would be to sanction an indefensible sort of entrapment by the State – convicting a citizen for exercising a privilege which the State had clearly told him was available to him.'" *Id.* at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959)). In *Cox*, the police chief, among other officials at the scene, gave permission for the student demonstration to take place across the street from the courthouse, for which Cox was subsequently charged.

[13]Act of August 27, 1954, ch. 1009, 68 Stat. 868, *codified as amended at* 25 U.S.C.A. §§ 677-677aa (2001). As the Tenth Circuit has explained:

> The purpose of the Act was to divide and distribute "the assets of the Ute Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof," to terminate federal supervision over the mixed-blood members, and to prepare the fullblood members for termination of federal supervision over them. 25 U.S.C. § 677.

*United States v. Murdock*, 132 F.3d 534, 535 (10th Cir. 1997), *cert. denied*, 525 U.S. 810 (1998). The so-called Termination Policy was repudiated by the federal government before the "full-blood" Utes were ever considered to be ready for termination. *United States v. Felter*, 546 F.Supp. 1002, 1006 n.5 (D. Utah 1982), *aff'd*, 752 F.2d 1505 (10th Cir. 1985). The remaining "full-blood" members of the Ute Indian Tribe continue to belong to a federally recognized

(continued...)

-12-

the Final Mixed-Blood Roll prepared pursuant to that Act cannot be deemed to be terminated from federal recognition as an "Indian" or as a tribal member of the Uintah Band of Indians. Reber's first two premises reflect well-settled principles of federal Indian law that were not in genuine dispute in his State court appeals; his third and fourth premises have already been expressly rejected by the Tenth Circuit in prior cases; and his fifth and final—and most novel— premise cannot be decisive of Reber's claim to § 2254 relief in this proceeding.

### Indian Tribal Hunting and Fishing Rights

"The right to hunt and fish on reservation land is a long established tribal right." *United States v. Felter*, 752 F.2d 1505, 1509 (10th Cir. 1985).  Moreover, "'[a]side from the right to hunt or fish on tribal lands to the exclusion of others, the tribe possesses the discretion inherent in the police power to regulate and allocate the fish and game resources as it sees fit, within the constraints imposed by law.'"  *Id.* at 1511 (quoting *United States v. Felter*, 546 F. Supp. 1002, 1023 (D. Utah 1982));[14] *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983) (comprehensive tribal regulatory scheme preempted state regulation of non-member hunting and fishing on the reservation).

Nothing in the Utah Supreme Court's *Reber* opinion disputes this proposition.

### Tribal Authority to Determine Membership

In the absence of express legislation by Congress to the contrary, a tribe has complete

---

[13](...continued)
Indian tribe, along with those who have subsequently been enrolled as members under the Tribe's constitution, by-laws and membership ordinances.

[14]In *United States v. Felter*, the Tenth Circuit held that the Ute Partition Act did not abrogate tribal hunting and fishing rights of the so-called "mixed-blood" Ute Indians who were thereby terminated from federal supervision and Ute tribal membership.

authority to determine all questions of its own membership.  *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."); *MacArthur v. San Juan County*, 497 F.3d 1057, 1074 (10th Cir. 2007) (noting that "'Indian tribes retain their inherent power . . . to determine tribal membership'") (quoting *Montana v. United States*, 450 U.S. 544, 564 (1981))); *Williams v. Gover*, 490 F.3d 785, 789 (9th Cir. 2007) ("An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress."); *Ordinance 59 Assn. v. United States Dept. of the Interior*, 163 F.3d 1150 (10th Cir. 1998) (noting that Indian tribes "tribes . . . have exclusive authority on membership determinations for tribal purposes"); *Adams v. Morton*, 581 F.2d 1314, 1320 (9th Cir. 1978) ("[U]nless limited by treaty or statute, a Tribe has the power to determine tribal membership."); *Apodaca v. Silvas*, 19 F.3d 1015, 1016 (5th Cir. 1994) (per curiam); *Smith v. Babbitt*, 100 F.3d 556 (8th Cir. 1996); *Prairie Band of Pottawatomie Tribe of Indians v. Udall*, 355 F.2d 364 (10th Cir. 1966). See also, Felix S. Cohen, *Handbook of Federal Indian Law* 98-100, 133-37 (1942 ed.).

In *Reber*, the Utah Supreme Court expressly acknowledged this general principle: "we are not at liberty to decide which individuals are or should be 'recognized as an Indian' by Indian tribes or the federal government.  Such recognition is at the discretion of those entities."  2007 UT 36, ¶ 26, 171 P.3d at 410; *accord Murdock*, 132 F.3d at 540 ("We are not at liberty to define tribal membership in a manner at odds with the Tribe's exercise of its sovereign right to do so.")

Reber's first two premises thus remain beyond dispute.  But by themselves, they are not decisive of his § 2254 claim.

-14-

Reber's third and fourth premises, *viz.*, that the Uintah Band of Indians continues to exist as a federally recognized Indian tribe separate and apart from the Ute Indian Tribe of the Uintah and Ouray Reservation, and that it retains hunting rights within that reservation, appear essential to his claim for § 2254 relief, but they have already been rejected by the Tenth Circuit.

### Continuing Existence of the Uintah Band of Indians

This court has already summarized the early history of the Uintah Valley Reservation, which was set aside for the use and occupancy of the Uintah Band, among others. *See Ute Indian Tribe v. State of Utah*, 521 F Supp. 1072, 1092-1100, 1111-1132 (D. Utah 1981), *aff'd in part, rev'd in part en banc*, 773 F.2d 1087 (10th Cir. 1985); *see also Ute Indian Tribe of the Uintah and Ouray Reservation v. State of Utah*, 114 F.3d 1513 (10th Cir. 1997), *cert. denied*, 522 U.S. 1107 (1998).

Pursuant to provisions of the Indian Reorganization Act of 1934, 25 U.S.C.A. § 476 (2001), the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937. *See* Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation (approved January 19, 1937) (*available at* http://thorpe.ou.edu/IRA/utecons.html).

> Thereafter, in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition, which began with the Constitution, from loosely-knit bands to unified Ute Tribe. . . . Under the resolutions, the entire Tribe would share equally in all tribally-held land, in any proceeds from such land, and in any claims for lands ceded to the United States which predated the formal creation of the Ute Indian Tribe without regard to band derivation.

*Hackford v. Babbitt*, 14 F.3d 1457, 1461 (10th Cir. 1994) (record citations omitted). The Tenth Circuit read these documents as extinguishing the separate existence of the Uintah Band:

The Preamble to the Constitution of the Ute Indian Tribe states that "the Ute Indians of the Uintah, Uncompahgre and Whiteriver Bands hereafter to be known as the Ute Indian Tribe of the Uintah and Ouray Reservation . . . do ordain and establish this Constitution for the Ute Indian Tribe of the Uintah and Ouray Reservation." . . . Article I provides that "[t]he Jurisdiction of the Ute Indian Tribe of the Uintah and Ouray Reservation shall extend to the territory within the original confines of the Uintah and Ouray Reservation. . . ." Significantly, Article VI, § 4 states:

> Any rights and powers heretofore vested in the Tribe or bands of the Uintah and Ouray Reservation but not expressly referred to in this Constitution shall not be abridged by this article, but may be exercised by the people of the Uintah and Ouray Reservation *through the adoption of appropriate By-laws and constitutional amendments*.

> The Constitution thus makes clear that the Bands ceased to exist separately outside the Ute Tribe, that jurisdiction over what was formerly the territory of the Uintah Band was to be exercised by the Ute Tribe, and that the rights formerly vested in the Uintah Band were to be defined by the Ute Constitution and exercised by the Ute Tribe. . . .

*United States v. Murdock*, 132 F.3d 534, 541 (10th Cir. 1997), *cert. denied*, 525 U.S. 810 (1998)(emphasis supplied by court; record citations omitted). "In light of these provisions," the Tenth Circuit concluded, "Mr. Murdock's argument that the Uintah Band's hunting and fishing rights retain a separate existence and belong only to the Uintah Band is groundless. Even if Mr. Murdock is correct that the Uintah Band continues to maintain its own identity, under the Ute Constitution the Band does so only within the context of the Ute Tribe." *Id.*

### Hunting Rights of the Uintah Band

In the State courts, Reber and others argued that once an Indian tribe acknowledges persons as members, the sole question remaining for the court is whether the tribe holds hunting rights, not whether the defendants are Indians. As to that "sole question," the *Reber* court simply followed federal law as previously decided by the Tenth Circuit in *Murdock*: "'[the] argument

that the Uintah Band's hunting and fishing rights retain a separate existence and belong only to the Uintah Band is groundless.'" *Reber*, 2007 UT 36, ¶ 24, 171 P.3d at 410 (quoting *Murdock*, 132 F.3d at 541). Where the defendants "concede that they are not members of the Ute Tribe," *id.* at ¶ 25, it follows that Reber and others were not Indians exercising tribal hunting rights on Uintah and Ouray Indian Reservation lands free from State jurisdiction. *Id.* at ¶¶ 25-27, 171 P.3d at 410-11.

In *Murdock*, the Tenth Circuit concluded that Murdock "has no right of user in hunting and fishing rights originally granted to the Uintah Tribe"—rights now owned and regulated by the Ute Indian Tribe and exercised by its members and persons named on the Final Mixed-Blood Roll—and it affirmed his conviction under 18 U.S.C.A. § 1165 (2000), which prohibits hunting on land belonging to an Indian Tribe without lawful authority or permission. 132 F.3d at 535, 541.[15]

The *Reber* court reached essentially the same conclusion regarding the petitioner for essentially the same reasons, and it affirmed the juvenile court's exercise of jurisdiction and its adjudication of Reber's delinquency.

---

[15]*Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002), does not hold to the contrary. While the panel in that case ruled that "the Tribe here may establish federal question jurisdiction in asserting its hunting rights despite the fact that it is not recognized by the Department of the Interior," *id.* at 1203-04, it did *not* hold that "as Indians of Utah Territory inhabiting the Uinta Valley, the plaintiffs had made out a prima facie case that they possessed the right to hunt and fish on the Uintah and Ouray Reservation," a Reber's Petition now asserts. (Petition at 6.) The *Timpanogos Tribe* panel simply agreed with the district court that if taken as true, the allegations of the complaint were sufficient to survive a Rule 12(b) motion to dismiss. 286 F.3d at 1204.

On remand, the court granted summary judgment in favor of the defendants, rejecting the plaintiff's assertion that the Uintah Valley Reservation was set aside for the Timpanogos Shoshones rather than the Ute bands that came to reside there and still govern the reservation today. (*See* Order, filed January 24, 2005 (dkt. no. 153), *Timpanogos Tribe v. Conway*, Civil No. 2:00-CV-734TC (D. Utah).) The Timpanogos Tribe failed to rebut expert testimony establishing that the Timpanogos Band merged with the Uintah Band circa 1865 and ceased to maintain a tribal identity independent of the Uintah Band or the Ute Tribe. (*Id.*) The plaintiff's appeal from that ruling was subsequently dismissed pursuant to 10th Cir. R. 42.1 for failure to prosecute. *See* Order, *Timpanogos Tribe v. Conway*, Case No. 05-4059 (10th Cir. October 19, 2005) (unpublished disposition).

### Reber and the Ute "Mixed-Blood" Roll

Reber attempts to chart a course that avoids the shoals of existing Tenth Circuit precedent by asserting his fifth premise: that his father, a Uintah Band member, effectively opted out of termination of federal recognition of his Indian status under the Ute Partition Act through his omission from the Final Mixed-Blood Roll promulgated by the Secretary of the Interior pursuant to that Act.[16]

As the court of appeals explained in *Murdock*, the Ute Partition Act:

defined full-bloods as those tribal members possessing one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half a degree, *id.* § 677a(b), and defined mixed-bloods as those members who did not possess sufficient Ute or Indian blood to fall within the definition of full-bloods and those full-bloods who chose to be designated as mixed-bloods, *id.* § 677a(c). Pursuant to the Act, proposed rolls were drawn up listing the names of the mixed-bloods and the full-bloods, and were published in the Federal Register and relevant county newspapers.  *Id.* § 677g.  After a period during which protests over inclusion in or exclusion from the rolls could be made to the Secretary of the Interior, the proposed rolls became final.  *Id.*  Upon publication of the final rolls, it was declared that "the tribe shall . . . consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter. New membership in the tribe shall thereafter be controlled and determined by the constitution and bylaws of the tribe and ordinances enacted thereunder."  *Id.* § 677d.

Once the final rolls were published, the tribal assets were divided based upon the relative numbers of persons on the two rolls, *id.* § 677i, and the assets of the mixed-bloods were distributed to them individually, *id.* § 677l.  Those tribal assets that were "not susceptible to equitable and practicable distribution" were to be managed jointly by a tribal committee and authorized representatives of the mixed-bloods.  *Id.* § 677i.  Although the UTA did not specifically address tribal hunting and fishing rights, *United States v. Felter*, 752 F.2d 1505, 1509 (10th Cir.1985), we have held that "the right to hunt and fish on the reservation is an 'asset[ ] not susceptible to equitable and practicable distribution' under § 677i,"

---

[16]The final rolls published on April 5, 1956, identified 490 members of the Ute Indian Tribe as "mixed-bloods." *See Mixed-Blood Members and Full-Blood Members of Ute Indian Tribe of Uintah and Ouray Reservation, Utah*, 21 Fed.Reg. 2208 (April 5, 1956).

*id.* at 1512.

132 F.3d at 535-36; *see also Chapoose v. Clark*, 607 F. Supp. 1027, 1030 (D. Utah 1985)

(Winder, J.) ("It was intended that after the mixed-blood members had been separated from the

tribe and proper distribution made of the tribal property the fullblood members would continue

the tribal government under the constitution, bylaws, and charter previously adopted by the tribe

pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984).").  In *Felter*, the Tenth

Circuit held that persons named on the final Mixed-Blood Roll retained the right to hunt and fish

on the Uintah and Ouray Reservation subject to tribal regulation, notwithstanding termination of

federal recognition of their Indian status.[17]  In *Murdock*, the Tenth Circuit held that descendants

of persons named on the Final Mixed-Blood Roll have no right of user in the Ute Indian Tribe's

hunting and fishing resources, through inheritance or otherwise.

Reber submits that while his father, Rickie L. Reber, was born in 1952—prior to the 1954

enactment of the Ute Partition Act—he was not listed on either the final Full-Blood or Mixed-

Blood Rolls prepared in 1956.  It follows, petitioner suggests, that because Rickie L. Reber was

not listed on the Final Mixed-Blood Roll, he cannot have been terminated from federal

recognition of his Indian status; he thus remains a member of a federally recognized Indian tribe,

namely the Uintah Band of Indians, and may exercise any tribal hunting rights the Uintah Band

may still have.  (Petition at 15-16.)

The Utah Supreme Court rejected the Rebers' claims of Indian status, observing that the

"Defendants' ancestors, through which they claim Indian blood, were individually listed on the

---

[17]"The United States actually ended its supervision over the affairs of the mixed-blood Utes and terminated its
trust relationship with them on August 24, 1961. See Ute Termination Proclamation, 26 Fed.Reg. 8042 (1961)."
*Murdock*, 132 F.3d at 536.

Ute Partition Act final termination roll." 2007 UT 36, ¶ 23, 171 P.3d at 410 (footnote omitted).

> An individual born to "parents [who] were listed on the final roll [of the Act]" was "not a member of the Ute Indian Tribe." "'Nor can the children of a terminated [parent] claim membership in the tribe through [that] parent.'" Because Defendants' ancestors lost their legal status as Indians, Defendants have no Indian blood for purposes of being recognized by an Indian tribe or the federal government.

*Id.* (footnotes omitted) (quoting *Murdock*, 132 F.3d at 536); *cf. Chapoose v. Clark*, 607 F. Supp.

at 1036 (concluding that "[n]o person who received a share of tribal assets as a mixed-blood can

now gain membership in the tribe under § 1(b) of article II of the tribal constitution. Nor can the

children of a terminated mixed-blood claim membership in the tribe through their mixed-blood

parent."). Relying on *Murdock*, the Utah Supreme Court also rejected the Rebers' claim of tribal

membership in the Uintah Band: "under federal law, the Uintah Tribe no longer has a separate

existence apart from the Ute Tribe. As a result, Defendants do not belong to a federally

recognized tribe and are not Indians under federal law." *Id.* at ¶ 25, 171 P.3d at 410.

The *Reber* opinion does not explicitly address the legal effect—if any—of the omission

of Rickie L. Reber's name from the Final Mixed-Blood Roll. Whatever the Utah Supreme Court

may have thought about that question, it appears that it did not affect the outcome.

Petitioner points out that no appellate court, state or federal, has ever addressed the legal

effects of the Ute Partition Act on persons whose names were entirely omitted from the final

rolls. (Petition at 15.) He argues that applying well-known canons of construction that liberally

construe federal statutes in favor of Indians[18] should "leave no doubt that such persons cannot be

---

[18]"The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). These rules of statutory construction generally "provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited." *Felix S. Cohen's Handbook*

(continued...)

terminated from federal supervision."  (*Id.* at 15-16.)

Assuming that the Tenth Circuit has correctly concluded that the Uintah Band has no separate tribal existence apart from the Ute Indian Tribe after the adoption of the 1937 Constitution, it would appear that the decisive question is whether petitioner or his father are members of the Ute Indian Tribe following the promulgation of both final rolls under the Ute Partition Act.[19]  But that issue will not be decided in the context of this proceeding.

Whatever the merits of Reber's theory of statutory construction may be, it cannot serve as the basis for granting relief under § 2254.  Having not yet been addressed by any state or federal appellate court, Reber's reading of the Ute Partition Act cannot fairly be said to represent "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A.

_____

[18](...continued)

*of Federal Indian Law* 225 (Rennard Strickland, et al., eds. 1982); *see, e.g.*, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (explaining that "the standard principles of statutory construction do not have their usual force in cases involving Indian law. . . . [S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").  Indeed, the Tenth Circuit instructs that "the canon requiring resolution of ambiguities in favor of Indians is to be given the 'broadest possible scope,' remembering that '[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent.'"  *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002) (quoting *DeCoteau v. Dist. County Court*, 420 U.S. 425, 447 (1975)).

As Judge Winder observed some years ago, the construction of the Ute Partition Act "is exactly this type of case where the special canons of construction must be applied."  *Chapoose v. Clark*, 607 F. Supp. at 1035.

[19]The language of the Act itself indicates that they are not.  As *Murdock* points out, § 5 of the Ute Partition Act, 25 U.S.C.A. § 667 (2001), reads:

> **§ 677d. Restriction of tribe to full-blood members after publication of final rolls; non-interest of mixed-blood members; new membership**
>
> Effective on the date of publication of the final rolls as provided in section 677g of this title the tribe shall thereafter consist exclusively of full-blood members.  Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter.  New membership in the tribe shall thereafter be controlled and determined by the constitution and bylaws of the tribe and ordinances enacted thereunder.

Thus it would appear that *inclusion* on the Final Full-Blood Roll or subsequent enrollment under the Ute tribal constitution, by-laws and ordinances—not omission from the Final Mixed-Blood Roll—would be decisive of the question of tribal membership.  *Cf. Chapoose v. Clark*, 607 F. Supp. at 1034-36 (finding that "Congress expressly intended that the Ute Indian Tribe be able to control its own membership after the 1954 Act.").

§ 2254(d)(1).  It follows that it cannot fairly be concluded that the Utah Supreme Court's ruling in *Reber* "was contrary to, or involved an unreasonable application of" clearly established federal law—the essential statutory prerequisite for granting § 2254 relief.

**CONCLUSION**

"The tribal status of the Mixed-Blood Utes is the most complex of the terminated tribes." *Cohen's Handbook of Federal Indian Law* § 3.02[8][b], at 167 (Nell J. Newton et al., eds. 2005) (footnote omitted).  And although the Ute Partition Act was enacted in 1954, "it continues to generate considerable litigation, criticism, and controversy" more than a half-century later. *Murdock*, 132 F.3d at 535; *see, e.g.*, *Hackford v. Babbitt*, 14 F.3d 1457, 1463-64 (10th Cir. 1994) (listing cases); *see also* R. Warren Metcalf, *Termination's Legacy: The Discarded Indians of Utah* (2002); Parker M. Nielson, *The Dispossessed: Cultural Genocide of the Mixed-Blood Utes* (1998).

While the merits of persistent questions concerning the construction and legal effect of the Ute Partition Act may ultimately be decided in a federal judicial forum, *cf. Felter v. Norton*, 412 F. Supp. 2d 118 (D.D.C. 2006), *vacated and remanded sub nom. Felter v. Kempthorne*, 473 F.3d 1255 (D.C. Cir. 2007), § 2254 does not afford Reber an appropriate procedural vehicle for pursuing that inquiry.  Viewing Reber's Petition through the narrow lens prescribed by the statute—whether the State court's ruling was "contrary to, or involved an unreasonable application of clearly established Federal law"—this court must conclude that "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief" under § 2254, and Rule 4 requires that "the judge must dismiss the petition and direct the clerk to notify the petitioner."

Therefore,

**IT IS ORDERED** that Colton Reber's Verified Petition for Habeas Corpus Relief Under 28 U.S.C. §2254 (dkt. no. 1), is hereby DISMISSED pursuant to Rule 4 of the Rules Governing Section 2254 Proceedings, and the Clerk of the Court will give proper notice of the same to the Petitioner forthwith.

DATED this ___ day of February, 2008.

BY THE COURT:

_____
BRUCE S. JENKINS
United States Senior District Judge

-23-

Therefore,

**IT IS ORDERED** that Colton Reber's Verified Petition for Habeas Corpus Relief Under 28 U.S.C. §2254 (dkt. no. 1), is hereby DISMISSED pursuant to Rule 4 of the Rules Governing Section 2254 Proceedings, and the Clerk of the Court will give proper notice of the same to the Petitioner forthwith.

DATED this 14ᵗʰ day of February, 2008.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-23-